# UNITED STATES DISTRICT COURT

for the
District of Alaska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>1 & 1 Mail and Media email account<br>schmidt720gci@mail.com | )<br>)<br>)<br>)<br>)<br>)     Case No.   3:15-mj-00372-KFM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A hereby incorporated by reference herein

located in the _____ District of _____ ALASKA _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B hereby incorporated by reference herein

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire fraud |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature Redacted

*Applicant's signature*

Craig P. Davis, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12-23-2015

/s/ Kevin F. McCoy
United States Magistrate Judge
Signature Redacted
*Judge's Signature*

City and state: Anchorage, AK

KEVIN F. McCOY
*Printed name and title*
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF Microsoft email account gle913@msn.com, Google email account 12dm2345@gmail.com, Google email account a1jb001@gmail.com, Google email account jekuczaj@gmail.com, 1&1 Mail and Media email account schmidt720gci@mail.com, and Yahoo email account isaiahhenriques@yahoo.com | Case Nos. 3:15-mj-00368-KFM 3:15-mj-00369-KFM 3:15-mj-00370-KFM 3:15-mj-00371-KFM 3:15-mj-00372-KFM 3:15-mj-00373-KFM |

**AFFIDAVIT**

I, Craig P. Davis, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately eleven years.  Before joining the FBI as a special agent in 2004, I obtained the equivalent of a bachelor's degree in computer science, completed graduate level course work in computer science, and obtained numerous technical certifications, including Cisco Certified Network Associate ("CCNA") and Microsoft Certified Systems Engineer ("MCSE").  I was also employed in the health care industry as Director of

Page 1 of 41

Information Technology for a multi-discipline health care company for approximately 5 years. Upon assignment to the Atlanta Division of the FBI in 2004, I was assigned to a squad responsible for investigating sophisticated frauds, including health care fraud and fraud against the government. Over the course of my FBI career, I have also obtained other technical training and cyber security certifications. Currently, I hold multiple cyber security certifications including Global Information Assurance Certification ("GIAC"), Security Essentials Certification ("GSEC"), the GIAC Perimeter Protection Analyst ("GPPA") certification, the GIAC Certified Intrusion Analyst ("GCIA") certification, and the GIAC Certified Incident Handler ("GCIH") certification. I am currently assigned to the Anchorage Field Division and to a squad responsible for investigating counterterrorism and domestic terrorism. Previously, I was assigned to a squad responsible for investigating national security and criminal cyber threats and computer intrusions, where I specialized in the investigation of computer and high-technology crimes, including computer intrusions, denial of service attacks, and other types of malicious computer activity. As a federal agent, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with authority to execute federal search warrants. Throughout my law enforcement

career, I have received training in and have gained experience in executing search warrants.

2.     I make this affidavit in support of application for search warrants for information associated with the following email accounts (collectively referred to as the "SUBJECT ACCOUNTS"):

A.     One Microsoft email account identified as gle913@msn.com ("gle913 SUBJECT ACCOUNT"), subscribed to an individual identified as Gerald Lee Eastman ("EASTMAN"), and stored at premises controlled by Microsoft Corporation ("MICROSOFT PROVIDER"), a provider of electronic communication and remote computing services headquartered at, 1 Microsoft Way, Redmond, WA 98052.[1]

B.     Three Google email accounts identified as 12dm2345@gmail.com ("12dm2345 SUBJECT ACCOUNT"), a1jb001@gmail.com ("a1jb001 SUBJECT ACCOUNT"), subscribed to by "best game," and jekuczaj@gmail.com ("jekuczaj SUBJECT ACCOUNT"), subscribed to by an individual identified as John Eugene Kuczaj ("KUCZAJ"). All three of these accounts are stored at premises controlled by Google Incorporated ("GOOGLE

---

[1] Because, as further detailed herein, this Court has jurisdiction over the offenses that are the subject of this investigation, this Court may issue the requested warrants. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).

PROVIDER"), a provider of electronic communication and remote computing services headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

    C. One 1 & 1 Mail and Media email account identified as schmidt720gci@mail.com ("schmidt720gci SUBJECT ACCOUNT"), stored at premises controlled by 1 & 1 Mail and Media Incorporated ("1 & 1 PROVIDER"), a provider of electronic communication and remote computing services headquartered at 701 Lee road, Suite 300, Chesterbrook, PA 19087.

    D. One Yahoo email account identified as isaiahhenriques@yahoo.com ("isaiahhenriques SUBJECT ACCOUNT"), stored at premises controlled by Yahoo Incorporated ("YAHOO PROVIDER"), a provider of electronic communication and remote computing services headquartered at 701 First Avenue, Sunnyvale, CA 94089.

    3. This affidavit is made in support of an application for a search warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and Federal Rule of Criminal Procedure 41, to require the MICROSOFT PROVIDER, the GOOGLE PROVIDER, the 1 & 1 PROVIDER, and the YAHOO PROVIDER (hereinafter collectively identified as "PROVIDERS"), to disclose to the government copies of the information (including the content of communications) described in Section II of

Attachment B for the period September 9, 2014, to present for the reasons further stated below. *See, e.g., infra* ¶ 41. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference in full.

4. As described more fully below, I respectfully submit there is probable cause to believe that information associated with the gle913 SUBJECT ACCOUNT, the 12dm2345 SUBJECT ACCOUNT, the jekuczaj SUBJECT ACCOUNT, the a1jb001 SUBJECT ACCOUNT, the schmidt720gci SUBJECT ACCOUNT, and the isaiahhenriques SUBJECT ACCOUNT (hereinafter collectively identified as "SUBJECT ACCOUNTS") contain evidence and constitute instrumentalities of certain criminal offenses, including but not limited to, violations of 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. § 1343 (Wire fraud) (hereinafter collectively referred to as the SUBJECT OFFENSES). Specifically, the SUBJECT ACCOUNTS likely were used to carry out, and likely contain evidence of, a series of computer intrusions and a scheme to defraud perpetrated on an Alaskan company, a Virginia company, and a California company.

DEC 2 3 2015

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, analysis of documents and records gathered to date, and from other sources. This affidavit is intended to show merely that there is probable cause for the requested warrants to issue and does not purport to set forth all of my knowledge of or investigation into this matter.     Unless specifically stated otherwise, all conversations and statements described in this affidavit are set forth in substance and in part, rather than verbatim.     All events detailed in this affidavit occurred on or about the dates noted.

## II.     **RELEVANT STATUTES**

6.     The search warrants requested seek authority to seize and search instrumentalities and evidence of violations of the SUBJECT OFFENSES, namely, the offenses set forth in the following paragraphs.

7.     18 U.S.C. § 371, in pertinent part, makes it unlawful for "two or more persons [to] conspire . . . to commit any offense against the United States . . . [if] one or more of such persons do any act to effect the object of the conspiracy."

8.     18 U.S.C. § 1343 makes it unlawful to "having devised or intending to devise any scheme or artifice to defraud, or for

Page 6 of 41

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, sings, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

## III. BACKGROUND INFORMATION AND TERMINOLOGY RELATED TO CYBERCRIME

### Types of Email Accounts Commonly Used by Cyber Criminals

9.    I know, based on my training and experience and discussions with other agents, that hackers and other cyber criminals will often use different email accounts for different purposes.    They do this in an attempt to separate their communications involving computer intrusions or operational activities from their communications about legitimate activities or personal life.    Often, however, there is common information, including subscriber information and access records, that can be used to connect the various accounts together allowing the illegal activities to be linked back to the specific person or persons responsible.

10.    Illicit Accounts:    Illicit accounts are used by subjects to plan, coordinate, carry out, and communicate about criminal activities in which they intend to engage.    Such accounts are used primarily to coordinate their illicit

activities with other actors or third parties related to the scheme, be it to communicate about acquiring supplies, plan how to communicate or meet, or other activities including carrying out hacking activities. The users of such accounts often do not overtly reference their names, or if they make any identifying references, those references are often to an alias or fictitious name.

11. <u>Personal Accounts</u>: Persons involved in cybercrime who use illicit accounts also often use personal accounts. Personal accounts are often used in true name, are used to communicate with family or friends, and may contain information that may be personal or about everyday activities not related to illegal activities. When it can be shown that the user of an illicit account is also the user of a personal account, the evidence that resides on the personal account is relevant to showing the identity, location, acquaintances, activities, and residence of the user of the illicit account, which is often used anonymously or in alias, even if the personal account does not contain direct evidence of any illegal activities.

## Types of Information Commonly Found in Email Subscriber Records

12. When a customer registers a new email address or account with a service provider, the service provider commonly asks for certain information associated with the subscriber,

such as the subscriber's name, phone number, and an alternate or secondary email address or addresses. The phone numbers or secondary email addresses may be used for various purposes.

13. A secondary, or recovery, email account, is an email account that is registered with an email service provider and used to confirm the subscriber's identity, and "recover" or "reset" a password that has been lost, forgotten, or changed by someone other than the subscriber. As an alternative, a subscriber may register a SMS telephone number with the provider, which can also be used to verify identity, and to recover a lost or stolen password. In that way, providers may use a secondary email account to communicate with the subscriber in the event the subscriber forgot his or her password for the account or to complete what is commonly referred to as "two factor" authentication for logging onto an email account. In that scenario, the two factors are first, the username and password credentials, and second, the verification code sent via SMS text to the subscriber's telephone, to corroborate the fact that the person logging in is the person who uses and has physical possession of the cell phone using the number entered when the account was subscribed.

14. I also know based on my training and experience that often when two different user accounts or email accounts each

list the same email address as the secondary email, the two accounts are used by the same person or persons by virtue of the fact that the user of each of those accounts is also the person with access to the common secondary email address.

### Internet Protocol ("IP") Address Information

15. Subscriber information and transactional records of email accounts can show the Internet Protocol address ("IP address") used to register and/or access an email account at a particular date and time. IP addresses can be used to identify the true identity of the user of those specific accounts by comparing the IP addresses used to access those accounts on particular dates at particular times.

16. An IP address, is a unique numeric address used by networked devices on the Internet. These devices can include individual computers, phones, tablet computers, or network routers that connect multiple devices at once such as those commonly found in home networks. An IP address is a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every networked device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Many providers control a range or a block of IP addresses.

Page 10 of 41

17. I also know, based on my training and experience, that IP addresses can be concealed to hide the true location of the device by using various tools that are free and available on the Internet or by purchasing services for that purpose. Concealing an IP address can be accomplished via several techniques, including the use of proxies, and using other compromised computer systems as a relay so as to conceal the IP address used by the hacker. Proxies are computers or servers that will relay data between the user's computer and the target website or server with which the user is trying to connect, so that the target will not see the user's true IP address, only the proxy's.

18. The techniques also include connecting via a Virtual Private Network ("VPN") to provide privacy while using the Internet, which can permit a user in one location to communicate securely---such as by means of secure protocols or encryption---with computers in other locations, while also concealing his or her true location or IP address. For example, this allows an individual to appear as if they are using a device from Houston, Texas, when in fact the user is using the device in Lagos, Nigeria. VPNs are widely used by organizations to provide secure communication for their employees, but may also be used for nefarious purposes in an attempt to thwart traditional law

Page 11 of 41

enforcement investigative techniques by hiding the true locations of those using VPNs, particularly if the IP addresses originated in multiple foreign countries.

## IV.   BACKGROUND REGARDING EMAIL AND THEIR PROVIDERS

19.   Because this affidavit is submitted in support of warrants for email accounts, this section provides background on the information that may be stored by providers of such accounts.

20.   In my training and experience, I have learned that email providers provide a variety of online services, including email, to the public.  The email providers allow subscribers to obtain email accounts, such as the SUBJECT ACCOUNTS at domains, like yahoo.com, mail.com, hotmail.com, and gmail.com. Subscribers obtain accounts at email providers by registering with the providers.  And, during the registration process, the providers ask subscribers to provide basic personal information. Therefore, the providers' servers are likely to contain stored electronic communications and information concerning subscribers and their use of the provider's services, such as account access information, email or message transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under

Page 12 of 41

investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNTS.

21. A subscriber of an email provider can also store with the provider certain files in addition to emails, such as address books, contact or buddy lists, instant messenger conversations, calendar data, pictures (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the provider. In my training and experience, evidence of who was using an email account and evidence of a crime may be found in such information.

22. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used, among other ways, to identify the user(s) of the SUBJECT ACCOUNTS.

23. In my training and experience, providers typically retain certain transactional information about the creation and

use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNTS at a particular point in time, which in turn can be used to assist with identifying the user(s) of the SUBJECT ACCOUNTS.

24. In my training and experience, email account users will sometimes communicate directly with a service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the providers support services, as well as records of any

Page 14 of 41

actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNTS.

25. I know from my training and experience that the complete contents of an email account may be important to establishing the actual user who has dominion and control of that account at a given time. The majority of online accounts offered by email providers, including the email accounts that are the subject of this affidavit, that is, the SUBJECT ACCOUNTS, may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which such online accounts are created under aliases, and the rarity with which law enforcement has eyewitness testimony about a target's use of the account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal

Page 15 of 41

activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide the government or a target with sufficient information to identify other users of the account. Therefore, the contents of a given account, including, but not limited to email addresses, usernames, conversations, and messages sent to that account, often provide important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNTS, I am requesting a warrant requiring the providers of the listed SUBJECT ACCOUNTS to turn over all information associated with the SUBJECT ACCOUNTS with the date restriction included in Attachment B for review by the search team.

26. Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNTS. If the government were constrained to review only a small subsection of an email account, that small subsection might give the misleading impression that only a single user had access to the account and that would be a problem because multiple co-conspirators may have shared email accounts, and used those

DEC 2 3 2015

accounts to transfer information to one another, or to defraud victims.

27. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of email conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an email or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis – i.e., : ) - to convey a smile or agreement to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an email account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

28. As set for the in Attachment B, I am requesting a warrant that permits the search team to keep the original

Page 17 of 41

production from the providers under seal until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

A.    I make that request because I believe it might be impossible for the providers to authenticate information taken from the SUBJECT ACCOUNTS as their business records without the original production to examine. Even if the providers kept an original copy at the time of production (against which it could compare the results of the search at the time of trial), the government cannot compel the providers to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the providers to examine a particular document found by the search team and confirm that it was a business record of the providers taken from the SUBJECT ACCOUNTS.

B.    I also know from my training and experience that many email accounts are purged as part of the ordinary course of business by providers. For example, if an email account is not accessed within a specified time period, it - and its contents - may be deleted. As a consequence, there is a risk that the only record of the contents of an email account might be the production that a provider makes to the government, for example, if a target is incarcerated and does not (perhaps cannot) access

his or her email account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the target access to the evidence that might be used in his or her defense.

## V.   BACKGROUND INFORMATION CONCERNING REAL ESTATE TRANSACTIONS

29.   I know, based on my training and experience, that real estate transactions typically involve multiple parties, including:

A.   The selling party ("SELLER(S)"), who are individuals selling real property.

B.   The purchasing party ("BUYER(S)"), who are individuals purchasing real property from the SELLER(S).

C.   The selling party's realtor ("SELLER REALTOR"), who represents the SELLER(S).

D.   The BUYER(S) realtor ("BUYER REALTOR"), who represents the BUYER(S).

E.   A title company or escrow company manager ("TITLE MANAGER"), manages the final sales transaction, transfer of title, and payment from BUYER(S) to SELLER(S) by way of an escrow account managed by the title company.

*KFM*

DEC 2 3 2015

Page 19 of 41

30. The BUYER(S) make an offer to purchase property from the SELLER(S) by submitting the offer through the BUYER REALTOR. To that end, the BUYER REALTOR prepares a purchase offer contract on behalf of the BUYER(S). The purchase offer includes certain information, including the names of the BUYER(S) and SELLER(S), identification of the title company or escrow company that will be used for closing the transaction, and the date of closing. This purchase offer is signed by the BUYER(S) and submitted by the BUYER REALTOR to the SELLER REALTOR who presents the offer to the SELLER(S).

31. A purchase offer is either accepted by the SELLER(S), rejected by the SELLER(S), or returned to the BUYER(S) with a counteroffer, by way of the realtors. When the BUYER(S) and SELLER(S) agree upon a purchase price, a final contract is signed by both parties. The final contract is submitted to the title company, along with other documentation, by the realtors on behalf of their respective clients (i.e., BUYER(S) and the SELLER(S)).

32. The TITLE MANAGER communicates exclusively with the BUYER REALTOR and the SELLER REALTOR until the day of closing. The BUYER REALTOR and SELLER REALTOR represent their clients in all exchanges of information and communications. Therefore, prior to closing, escrow and/or title companies are typically

Page 20 of 41

not provided with contact information, including email addresses, for the BUYER(S) or SELLER(S). At the time of closing, the BUYER(S) and SELLER(S) generally go in person to the title or escrow company. It is at that time that arrangements are made for the BUYER(S) and/or the BUYER(S) mortgage company to transfer payment to the SELLER(S), through an account held by the title or escrow company, to an account held by the SELLER(S) and/or the SELLER(S) mortgage company.

33. After the closing, the TITLE MANAGER initiates the transfer of payments, including any wire transfer of proceeds from the sale of property to the SELLER(S) bank account.

## V.   SUMMARY OF INVESTIGATION

34. On August 7, 2015, I initiated this investigation after a title company doing business in Alaska ("ALASKA COMPANY") contacted the FBI and reported that they had been defrauded. Further investigation has shown that unidentified "hacker(s)"[2] perpetrated an intrusion of the ALASKA COMPANY's email system and thereafter defrauded the ALASKA COMPANY and/or its clients by: (1) using information gleaned by accessing the ALASKA COMPANY's email system without authorization to create

---

[2] A hacker is commonly defined as someone who seeks and exploits weaknesses in a computer system or computer network. A hacker may be motivated by profit, protest, or the challenge of the task.

Page 21 of 41

fraudulent emails that appeared to have been sent by clients
(*e.g.*, to identify the names of real clients of the ALASKA
COMPANY, who were owed proceeds from a real estate transaction
handled via the ALASKA COMPANY); and (2) sending fraudulent
emails -- using two of the SUBJECT ACCOUNTS (namely, the
12dm2345@gmail.com SUBJECT ACCOUNT and schmidt720gci@mail.com
SUBJECT ACCOUNT) -- to the ALASKA COMPANY that directed the
ALASKA COMPANY to send the funds that the ALASKA COMPANY's
clients expected to a bank account controlled by co-
conspirator(s) of the hacker(s), rather than to the bank account
the clients had previously provided to the ALASKA COMPANY (*i.e.*,
the real clients' bank account).  Additionally, my investigation
has revealed that another SUBJECT ACCOUNT (namely, the
a1jb001@gmail.com SUBJECT ACCOUNT) was used in a similar manner
to attempt to defraud a Virginia title and escrow company
("VIRGINIA COMPANY") in August 2015, and to defraud a California
escrow company ("CALIFORNIA COMPANY") in September 2015.  As
further discussed below, the ALASKA COMPANY, VIRGINIA COMPANY,
and CALIFORNIA COMPANY incidents, to which each of the SUBJECT
ACCOUNTS relate in some regard, appear to be part of the same
conspiracy to commit the SUBJECT OFFENSES.

//

//

DEC 2 3 2015

## JUNE/JULY 2015: ALASKA COMPANY INCIDENT #1

35.   On   June   29,   2015,   clients   of   the   ALASKA   COMPANY ("ALASKA COMPANY CLIENT 1" and "ALASKA COMPANY CLIENT 2") closed on the sale of a residence at an ALASKA COMPANY office in Palmer, Alaska.   During the closing, ALASKA COMPANY CLIENT 1 and ALASKA   COMPANY   CLIENT   2   directed   the   ALASKA   COMPANY   TITLE MANAGER ("ALASKA COMPANY EMPLOYEE 1") to send the proceeds from their real estate sale to a particular bank account in Alaska.

36.   The   day   after   the   closing,   on   June   30,   2015,   an unidentified   subject   used   the   12dm2345   SUBJECT   ACCOUNT   to impersonate   CLIENT   1   and   to   send   email   messages   to   ALASKA COMPANY EMPLOYEE 1, with instructions to send the proceeds to a particular   bank   account   in   Reno,   Nevada,   rather   than   to   the Alaska bank account that ALASKA COMPANY CLIENT 1 provided at closing. [3]   Subscriber   information   for   the   12dm2345   SUBJECT ACCOUNT establishes that the email account was created on June 26,   2015,   from an IP address in Nigeria,   with its secondary or recovery   email   account   listed   as   the   isaiahhenriques   SUBJECT ACCOUNT.   Subscriber information for the isaiahhenriques SUBJECT ACCOUNT shows that email account was created from an IP address

---

[3] The fraudulent email sent from the 12dm2345 SUBJECT ACCOUNT on June 30, 2015, addressed ALASKA COMPANY EMPLOYEE 1 by name, and was signed in ALASKA COMPANY CLIENT 1's true name.   That email message, as noted above, requested information to initiate transfer of funds by wire to a particular bank account.

DEC 2 3 2015

in Canada under the name "Mr. Isaiah Henriques," and was repeatedly accessed from IP addresses in Nigeria and the United States during the time period in question.

37. From June 30, 2015, through July 1, 2015, the 12dm2345 SUBJECT ACCOUNT was used to exchange email messages with ALASKA COMPANY EMPLOYEE 1. During that same time frame, subscriber records for the 12dm2345 SUBJECT ACCOUNT show that: (1) unidentified person(s) used IP addresses in Nigeria to log in to the 12dm2345 SUBJECT; and (2) unidentified person(s) also used IP addresses originating from datacenters in Arizona, Texas, and Georgia, respectively, to log in to the 12dm2345 SUBJECT ACCOUNT. Based on my training and experience, this indicates that proxy servers were used to conceal the true location of the unidentified person(s) using the 12dm2345 SUBJECT ACCOUNT, and to make it appear as if the 12dm2345 SUBJECT ACCOUNT was being used by someone located within the United States, during the period that the email account was being used to defraud the ALASKA COMPANY.

38. Five of the approximately seven fraudulent email messages sent to ALASKA COMPANY EMPLOYEE 1 from the 12dm2345 SUBJECT ACCOUNT contained a "carbon copy" to an email address ("CARBON COPY EMAIL ADDRESS") that contained ALASKA COMPANY CLIENT 2's name. Upon further investigation, I obtained

Page 24 of 41

subscriber information for the CARBON COPY EMAIL ADDRESS, and determined the email address did not belong to ALASKA COMPANY CLIENT 2, and the CARBON COPY EMAIL ADDRESS was created on June 30, 2015 (*i.e.*, the date the first email message was sent from the 12dm2345 SUBJECT ACCOUNT to ALASKA COMPANY EMPLOYEE 1). However, the CARBON COPY EMAIL ADDRESS was never logged in to after it was created. Based on this investigation and my training and experience, this indicates the CARBON COPY EMAIL ADDRESS was created for the purpose of making email messages from the 12dm2345 SUBJECT ACCOUNT to ALASKA COMPANY EMPLOYEE 1 appear legitimate. Subscriber information obtained for the CARBON COPY EMAIL ADDRESS revealed that its secondary or recovery email account was the isaiahhenriques SUBJECT ACCOUNT (*i.e.*, the same account listed as the 12dm2345 SUBJECT ACCOUNT's secondary or recovery email address).

39. As a result of the fraudulent email messages sent from the 12dm2345 SUBJECT ACCOUNT to ALASKA COMPANY EMPLOYEE 1, between June 30, 2015, and July 1, 2015, the ALASKA COMPANY transferred the proceeds from the sale of the property, totaling $44,514.82, to a bank account that was controlled by a "John Eugene Kuczaj," in Reno, Nevada (the KUCZAJ bank account). *See also supra* ¶ 38. (For clarity's sake, neither ALASKA COMPANY CLIENT 1 nor ALASKA COMPANY CLIENT 2 authorized the proceeds

Page 25 of 41

from their real estate sale to be redirected to the KUCZAJ bank account.) Following the transfer, and on the same day, there were two cash withdrawals in Nevada that totaled $11,700 from the KUCZAJ bank account, in the amounts of $8,500 and $3,200, respectfully. Bank records further establish that, approximately two days later, on July 3, 2015, KUCZAJ transferred approximately $30,997.82 to another bank account that was controlled by "Gerald Lee Eastman" ("EASTMAN").

40. On July 8, 2015, ALASKA COMPANY CLIENT 1 and ALASKA COMPANY CLIENT 2 contacted the ALASKA COMPANY and inquired about why the proceeds from their real estate sale had not been deposited into their Alaska bank account as they had directed. As a result of this inquiry, the ALASKA COMPANY became aware of the fraud, and attempted to recover the money that the ALASKA COMPANY had unwittingly transferred to the KUCZAJ bank account. At that time, only $11.33 of the $44,514.82 that the ALASKA COMPANY had transferred to the KUCZAJ bank account remained in that bank account, and only approximately $17,000.00 remained in EASTMAN's bank account. As a result of the ALASKA COMPANY's efforts to recoup the money, EASTMAN returned $17,000 from EASTMAN's account to the ALASKA COMPANY's bank account.

41. Bank records related to the KUCZAJ bank account (*i.e.*, the Nevada bank account to which the 12dm2345 SUBJECT ACCOUNT

email fraudulently directed the ALASKA COMPANY to transfer the
$44,514.82) show that bank account was created on or around
September 9, 2014, and that the jekuczaj SUBJECT ACCOUNT was
provided to the bank as the contact information for this bank
account. Indeed, during my investigation to date, I have
identified four bank accounts created by KUCZAJ that list
KUCZAJ's email address as the jekuczaj SUBJECT ACCOUNT, and have
obtained records for those four bank accounts from as early as
January 1, 2015, until approximately September 14, 2015, to the
extent they existed. (For example, bank records show that, as a
result of the ALASKA COMPANY reporting the fraud to the bank in
July 2015, the bank closed the KUCZAJ bank account, which was
used in that fraudulent transaction on or around July 27, 2015
(*i.e.*, the account KUCZAJ created on September 9, 2014). That
same day (*i.e.*, July 27, 2015), KUCZAJ opened a new account with
the same bank and deposited approximately $20,921.33 into that
new account.) Review of these bank records during the period
January 1, 2015, to approximately September 14, 2015, reveals
KUCZAJ's accounts being used to conduct numerous suspicious
transactions, including sporadic large deposits, followed by
large withdrawals and transfers, which occurred close in time to
KUCZAJ's accounts being overdrawn and KUCZAJ being assessed
multiple overdraft fees. Based on my training and experience,
and as discussed further below, this pattern of transactions is

Page 27 of 41

DEC 2 3 2015
Case 3:15-mj-00372-KFM   Document 1   Filed 12/23/15   Page 28 of 42

consistent with bank accounts being used by a money mule. [4] Additionally, my review of the aforementioned bank records revealed transactions that have been identified as being tied to fraud complaints in other states, including a State of Missouri tax fraud investigation.

42.  Around the time EASTMAN returned $17,000 to the ALASKA COMPANY, and after KUCZAJ's bank had contacted both KUCZAJ and EASTMAN telephonically, EASTMAN contacted the ALASKA COMPANY. During that call, EASTMAN attempted to explain that the $44,514.82 transaction (i.e., the funds deposited into KUCZAJ's account) had something to do with a business transaction involving a business partner in London, England. EASTMAN also provided the ALASKA COMPANY with his contact information, including telephone number (760) 521-8621 and the gle913 SUBJECT ACCOUNT email address. EASTMAN also promised the ALASKA COMPANY that he would return another approximately $11,000.00 the following week, and the remainder of the approximately $44,514.82 at some future time. However, to date, neither EASTMAN, KUCZAJ, nor anyone else has returned any additional money to the ALASKA COMPANY.

---

[4] A money mule is commonly known as an individual who receives money illegally on behalf of another, and transfers money to other accounts controlled by co-conspirators. A money mule generally retains a portion of the money transferred as a type of commission for receiving and/or laundering money.

43.    I  obtained  subscriber  information  pertaining  to  the
gle913  SUBJECT  ACCOUNT,  and  determined  the  account  was  created
on  March  17,  2005,  under  the  name  "Lee  Eastman."  The  gle913
SUBJECT  ACCOUNT  was  also  repeatedly  accessed  during  the  relevant
dates,  in  June  2015  and  July  2015.

## SEPTEMBER 2015: ALASKA COMPANY INCIDENT #2

44.    On  September  25,  2015,  another  ALASKA  COMPANY  client
("ALASKA  COMPANY  CLIENT  3")  closed  on  the  sale  of  a  property  at
ALASKA  COMPANY's  office  in  Palmer,  Alaska.    Following  the
closing,  and  on  the  same  day,  an  unidentified  subject  used  the
schmidt720gci  SUBJECT  ACCOUNT  to  impersonate  ALASKA  COMPANY
CLIENT  3  and  to  send  an  email  message  to  an  ALASKA  COMPANY  title
manager  ("ALASKA  COMPANY  EMPLOYEE  2").    In  the  September  25,
2015,  email  sent  from  the  schmidt720gci  SUBJECT  ACCOUNT,  the
unidentified  subject  impersonating  ALASKA  COMPANY  CLIENT  3
fraudulently  directed  ALASKA  COMPANY  EMPLOYEE  2  to  send  proceeds
from  the  sale,  totaling  approximately  $331,000.00,  to  a  bank
account  controlled  by  3W  Development  LLC  ("3W  DEVELOPMENT")  in
Kaufman,  Texas  ("3W  DEVELOPMENT  bank  account").

45.    As  a  result  of  the  aforementioned  incident  involving
ALASKA  COMPANY  CLIENTS  1  and  2,  the  ALASKA  COMPANY  EMPLOYEE  2
became  suspicious  that  the  email  from  schmidt720gci  SUBJECT
ACCOUNT  was  fraudulent,  and  therefore,  the  ALASKA  COMPANY  did

Page 29 of 41

not transfer funds to the 3W DEVELOPMENT bank account. However, over the course of several days, ALASKA COMPANY continued to receive email messages from the schmidt720gci SUBJECT ACCOUNT demanding the transfer of money to the 3W DEVELOPMENT account.

46. During the investigation, I obtained subscriber records for the schmidt720gci SUBJECT ACCOUNT and determined that email account was created on September 25, 2015 (*i.e.*, which was the same day the account was used to send the aforementioned fraudulent email message to ALASKA COMPANY EMPLOYEE 2). I also determined the schmidt720gci SUBJECT ACCOUNT was accessed from an IP address that originated from the same datacenter in Texas that was used to access the isaiahhenriques SUBJECT ACCOUNT (*i.e.*, the account identified as the secondary or recovery account for the 12dm2345 SUBJECT ACCOUNT, which, as discussed above, was the email account used to defraud the ALASKA COMPANY in July 2015).

47. The ALASKA COMPANY has a computerized email system (*i.e.*, facility) that is used for private internal and external email communications. The system is secured by certain administrative policies and technical implementations, including a requirement for authorized users to provide their own username and password to access their private email accounts. This system was compromised by one or more subjects, who accessed

Page 30 of 41

DEC 2 3 2015
Case 3:15-mj-00372-KFM  Document 1  Filed 12/23/15  Page 31 of 42

(i.e. intruded upon) the facility without authorization. The
ALASKA COMPANY has advised that only its employees and certain
contractors are authorized to use or access their internal email
system and the other information technology systems that their
business uses. Neither KUCZAC, nor EASTMAN have ever been
employees or contractors for the ALASKA COMPANY, and the ALASKA
COMPANY further confirmed that, to the best of their knowledge,
no one they have employed or hired has the technological skills
to carry out an intrusion into its email system like those which
are at issue in this investigation.

48. Accordingly, my investigation to date indicates that
the ALASKA COMPANY's email system was compromised by hacker(s)
outside of the company, rather than an employee or contractor
with inside access to company information. For example, the
evidence gathered to date shows:

A. The ALASKA COMPANY hired contractors outside the
company to handle its information technology needs, and there is
no indication that any ALASKA COMPANY employee possessed the
technical expertise necessary to compromise the ALASKA COMPANY's
email system.

B. There is no evidence that any ALASKA COMPANY
employee or ALASKA COMPANY contractor was paid, or otherwise

Page 31 of 41

benefited from, the June 2015 or August 2015 incidents detailed above.

        C.    There is no known connection between any ALASKA COMPANY employee or ALASKA COMPANY contractor and EASTMAN, KUCZAJ, or any other co-conspirator identified to date.

        D.    Neither the ALASKA COMPANY's Internet service provider, nor information technology service provider, provided services to the VIRGINIA COMPANY or the CALIFORNIA COMPANY. Based on my training and experience, it is therefore highly unlikely that either the ALASKA COMPANY'S Internet service provider, or information technology service provider, were involved in the computer intrusions or scheme to defraud described herein.

## AUGUST 2015: VIRGINIA COMPANY INCIDENT

    49.    During my investigation of the ALASKA COMPANY incidents discussed above, I identified a related incident involving a title company in Virginia Beach, Virginia ("VIRGINIA COMPANY"), in which an email account, identified as the a1jb001 SUBJECT ACCOUNT, was used to impersonate a VIRGINIA COMPANY client ("VIRGINIA COMPANY CLIENT"). To be clear, the ALASKA COMPANY and the VIRGINIA COMPANY have no affiliation with one another.

Page 32 of 41

50.    I obtained subscriber information for the a1jb001
SUBJECT ACCOUNT and determined the account was created on July
17, 2015, under the name "best game," by an individual who used
a Nigerian telephone number to establish the account. [5]    IP
address connection logs indicated the account was created and
accessed from IP addresses in Malaysia.

51. On August 18, 2015, the VIRGINIA COMPANY CLIENT closed
on the sale of her property at the VIRGINIA COMPANY.  Following
the closing, and on the same day, an attorney representing
VIRGINIA COMPANY CLIENT received an email message from an
unidentified subject who impersonated VIRGINIA COMPANY CLIENT
using the a1jb001 SUBJECT ACCOUNT.  The unidentified subject
requested a wire transfer of proceeds from the sale of the
property to a bank account in Irvin, Kentucky.  As a result, the
VIRGINIA COMPANY CLIENT's attorney forwarded the request, which
appeared genuine, to a VIRGINIA COMPANY employee.

52.  The VIRGINIA COMPANY employee to whom the VIRGINIA
COMPANY CLIENT's attorney forwarded the fraudulent email,
proceeded to exchange email messages with the unidentified
subject, who used the a1jb001 SUBJECT ACCOUNT, believing the
unidentified subject to be the VIRGINIA COMPANY CLIENT.  As a

---

[5] The subscriber's SMS telephone number contained the country
code "234," which has been established as a country code for
Nigeria by the International Telecommunications Union, an agency
of the United Nations.

Page 33 of 41

result, the VIRGINIA COMPANY employee began the process of transferring approximately $148,000 to the bank account in Irvin, Kentucky, which was listed in the fraudulent email sent to the VIRIGINA COMPANY from the a1jb001 SUBJECT ACCOUNT. However, as the VIRGINIA COMPANY employee was about to initiate the transfer, the VIRGINIA COMPANY CLIENT happened to arrive at the VIRGINIA COMPANY office to retrieve the proceeds from the sale of her property. The VIRGINIA COMPANY CLIENT clarified that she had not authorized the proceeds to be redirected as the email from the a1jb001 SUBJECT ACCOUNT stated, had not sent any emails from the a1jb001 SUBJECT ACCOUNT, nor was she otherwise familiar with that email account. As a result, the VIRGINIA COMPANY did not transfer any money to the bank account set forth in the fraudulent email sent from the a1jb001 SUBJECT ACCOUNT.

## SEPTEMBER 2015: CALIFORNIA COMPANY INCIDENT

53. In investigating the ALASKA COMPANY incident, I obtained evidence that the a1jb001 SUBJECT ACCOUNT and the 3W DEVELOPMENT bank account were also involved in another related incident involving an escrow company in Beverly Hills, California ("CALIFORNIA COMPANY"). More specifically, an unidentified subject used the a1jb001 SUBJECT ACCOUNT to impersonate a husband and wife, who were clients of the CALIFORNIA COMPANY clients ("CALIFORNIA COMPANY CLIENT 1" and

"CALIFORNIA CLIENT 2"), and to fraudulently redirect funds from CALIFORNIA COMPANY to the 3W DEVELOPMENT bank account (*i.e.*, the bank account used during the second ALASKA COMPANY incident). To be clear, the CALIFNORIA COMPANY has no affiliation with either the ALASKA COMPANY or the VIRGINIA COMPANY.

54. On September 28, 2015, CALIFORNIA CLIENT 1 and CALIFORNIA CLIENT 2 closed on the sale of their real property at the CALIFORNIA COMPANY. Following the closing, and approximately the same day, a CALIFORNIA COMPANY employee ("CALIFORNIA COMPANY EMPLOYEE") received an email message from an unidentified subject impersonating CALIFORNIA COMPANY CLIENT 1 using the a1jb001 SUBJECT ACCOUNT (*i.e.*, the same account used to impersonate the VIRGINIA COMPANY CLIENT on August 18, 2015). The unidentified subject requested that the CALIFORNIA COMPANY wire the proceeds from the sale of CALIFORNIA CLIENT 1's and CALIFORNIA CLIENT 2's property to the 3W DEVELOPMENT bank account (*i.e.*, the same bank account specified in the email message from the schmidt720gci SUBJECT ACCOUNT to ALASKA COMPANY EMPLOYEE 2 on September 25, 2015, during the second ALASKA COMPANY incident). Believing the fraudulent email to have been sent from the CALIFORNIA COMPANY CLIENT 1, on September 30, 2015, the CALIFORNIA COMPANY affected the transfer of CALIFORNIA COMPANY CLIENT 1's AND CALIFORNIA COMPANY CLIENT 2's sale

Page 35 of 41

proceeds (approximately $144,405.78) to the 3W DEVELOPMENT bank account in Kaufman, Texas.

55. Upon further investigation, I determined the 3W DEVELOPMENT bank account was established on or around July 9, 2015. Between July 9, 2015 and September 30, 2015, there was a single deposit of $100 before the transfer of approximately $144,405.78 from CALIFORNIA COMPANY on September 30, 2015.

56. Following the transfer from the CALIFORNIA COMPANY to the 3W DEVELOPMENT bank account, and over the course of approximately two days, approximately $143,700.00 was withdrawn or transferred out of the 3W DEVELOPMENT bank as follows:

| Date | Transaction | Destination | Amount |
|------|-------------|-------------|--------|
| 10/01/2015 | Wire Transfer | Bank in Singapore | $78,200 |
| 10/01/2015 | Wire Transfer | Bank in the U.S. | $10,000 |
| 10/01/2015 | Cash Withdrawal | Unknown | $12,500 |
| 10/01/2015 | Cash Withdrawal | Unknown | $13,000 |
| 10/02/2015 | Cash Withdrawal | Unknown | $20,000 |
| 10/02/2015 | Cash Withdrawal | Unknown | $10,000 |

The cash withdrawals identified herein were drawn from bank branches in Texas.

Page 36 of 41

57.   I know, based upon my knowledge and experience involving computer networks and email systems, as well as computer intrusion and fraud investigations, that it is likely that unidentified hacker(s) compromised the electronic communication services used by the ALASKA COMPANY, VIRGINIA COMPANY, and CALIFORNIA COMPANY, respectively, from a remote location using the Internet.   After gaining unauthorized access to these companies' email and information technology systems, the unidentified hacker(s) accessed email messages that were sent to employees by other individuals involved in the real estate sales transactions described above.   As a result, the unidentified hacker(s) were able to gather information, including the names of the clients, the date of the closings, the amount of proceeds that the clients at issue would be paid at closing, and the employee handling the transfer of funds. This information was used to craft email messages to company employees that appeared genuine, and in turn to cause the recipient employees to transfer the proceeds per the fraudulent emails to the bank account listed, which in fact proved to be controlled by money mule co-conspirators (*e.g.*, the 3W DEVELOPMENT bank account in Texas, and KUCZAJ's bank account in Nevada).[6]

_____

[6]As noted above, *see supra* note 4, a money mule is commonly known

58.    I  have  also  obtained  experience  and  training  with regard  to  these  types  of  computer  intrusions  and  fraud investigations,  and  as  a  result  am  aware  that  investigations such  as  this  one  typically  involve  multiple  subjects  who  perform different  roles,  including  hackers  and  money  mules,  who collaborate  and  utilize  different  illicit  skills  to  defraud victims.    Hackers  that  are  located  outside  of  the  United  States that  target  United  States  companies  commonly  use  money  mules  and other  co-conspirators  who  are  located  in  the  United  States  to facilitate  their  fraudulent  schemes.    These  hackers  also commonly  use  sophisticated  techniques  to  compromise  victims' computer  systems  remotely  via  the  Internet,  and  to  send fraudulent  email  messages  to  trick  victims  into  sending  money  to bank  accounts  controlled  by  money  mules,  who  are  working  in concert  with  the  hacker(s).    The  money  mules  in  turn  transfer money  to  other  bank  accounts  controlled  by  other  money  mules,  or hackers.

59.    For  clarity's  sake,  as  previously  stated,  I  obtained subscriber  information  pertaining  to  the  12dm2345  SUBJECT ACCOUNT  (*i.e.*,  the  email  account  used  to  fraudulently  redirect

---

as an individual who receives money illegally on behalf of
another, and transfers money to other accounts controlled by co-
conspirators.  A money mule generally retains a portion of the
money transferred as a type of commission for receiving and/or
laundering money.

Page 38 of 41

sale proceeds from the ALASKA COMPANY to the KUCZAJ bank account in Reno, Nevada), and determined the account was created from an IP address in Nigeria on or around June 26, 2015. Subsequently, to include the dates and times that email messages were sent from the 12dm2345 SUBJECT ACCOUNT to the ALASKA COMPANY (*i.e.*, between June 30, 2015, and July 1, 2015), the 12dm2345 SUBJECT ACCOUNT was accessed from IP addresses in Nigeria and the United States. Based on my training and experience, this evidences that hacker(s) located in Nigeria compromised the ALASKA COMPANY's email system, and worked in concert with co-conspirators, including money mules, located within the United States, to fraudulently obtain funds from the ALASKA COMPANY, VIRGINIA COMPANY, and CALIFORNIA COMPANY.

## VII. REQUEST FOR NON-DISCLOSURE AND SEALING ORDER

60. Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the providers not to notify any person (including the subscribers or customers of the accounts listed in the search warrant) of the existence of the warrants. The current investigation set forth above is not public, and I know, based on my training and experience, if the provider or other person notified the targets of the investigation that a warrants have been issued for the SUBJECT ACCOUNTS it would seriously jeopardize the investigation, including by giving the

Page 39 of 41

targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise compromise this active, covert investigation.

61. I also respectfully request that this Court issue an order sealing all papers submitted in support of this application, including the application and search warrant, until further order of the Court. I believe that sealing these documents is necessary because the matters discussed therein, including Attachment B (i.e., items and information to be searched), reveal the existence and nature of an ongoing covert investigation, which would be compromised if disclosed at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums  Indeed, premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness and cause targets of this investigation to flee.

//

//  KFM

# VIII.     CONCLUSION

62.    I respectfully submit that this affidavit establishes that probable cause exists to support the issuance of a warrant to search the SUBJECT ACCOUNTS, described in Attachment A, and to search for and seize the items described in Attachment B. Based on the foregoing, therefore, I request that the Court issue the requested search warrants, non-disclosure orders, and sealing orders.

Signature Redacted

CRAIG P. DAVIS
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on December 23, 2015.

/s/ Kevin F. McCoy
United States Magistrate Judge
Signature Redacted

HONORABLE KEVIN F. MCCOY
UNITED STATES MAGISTRATE JUDGE

KFM

DEC 2 3 2015

Page 41 of 41